## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF NORTH CAROLINA

**UNITED STATES OF AMERICA**                              **CASE NO.19-cr-20104**

                    **Plaintiff,**

**v.**

**RAFAEL PIMENTEL**
                    **Defendant,**

_____/

## DEFENDANT'S MOTION FOR RELEASE BASED ON
## COMPASSIONATE RELIEF AND MEMORANDUM OF LAW

**COMES NOW**, the Defendant, through undersigned counsel and petitions This Court to release the defendant from custody and states as grounds thereof the following:

The United States of America is in the midst of an unprecedented pandemic. COVID-19 has paralyzed the entire world. The disease has spread exponentially, shutting down life as we know it, including schools, jobs, and professional sports seasons. There is no approved cure, treatment, or vaccine to prevent it. People with pre-existing medical conditions, like Mr. Pimentel, face a particularly high risk of dying or suffering severe health effects should they contract the disease. The Center for Disease Control (CDC) has set out numerous pre-existing conditions that coupled with a contraction of the COVID-19 virus produce an immensely high mortality rate.

have mortality rates that are more than twice as high as overall mortality rates. It should be noted, COVID-19 is a respiratory virus that directly impacts the lungs and respiratory system. A medical doctor trained in this specific area has evaluated Mr. Pimentel medical situation and furnished an opinion analyzing Mr. Pimentel specific medical situation.

The alarming statistics expressing the risk factors of the virus were focused on non-prison population. This becomes even more concerning when considering the prison population presents a tinderbox for infectious diseases. The question whether the government can protect inmates from COVID-19 is being answered every day, as outbreaks appear in new facilities. Various inmates have tested positive already and some have even passed away while being in federal custody. Based on the sheer numbers and small space of the prisons, it is just not possible to protect predisposed inmates adequately.

Because Mr. Pimentel is in a Federal Prison it is very difficult to receive accurate information about the number of infected individuals in that facility. Many individuals have gotten very sick recently and at least one staff member has been infected.

*(See Exhibit A – Memo from Warden Friend Regarding COVID-19 Case)*

I.    **LEGAL AUTHORITY**

A.    **MR. PIMENTEL CLEARLY MEETS THE LEGAL REQUIREMENTS FOR COMPASSIONATE RELEASE**

The First Step Act effected a sea of change in compassionate release for federal inmates. For the first time, Congress gave federal courts jurisdiction over this

matter only after concluding, based on statistics and decades of disappointment, that BOP was not adequately addressing the problem and the need for alternatives to incarceration for elderly and sick inmates. This is an unsurprising outcome given the elimination of parole in 1984.

One of Congress's initial goals in passing the Comprehensive Crime Control Act of 1984 was to abolish federal parole and create a "completely restructured guidelines sentencing system." S. Rep. No. 98-225, at 52, 53, n.196 (1983). Yet, recognizing that parole historically played a key role in responding to changed circumstances, the Senate Committee stressed how some individual cases may still warrant a second look at resentencing, including "cases of severe illness, cases in which other extraordinary and compelling circumstances justify a reduction of an unusually long sentence." *Id*. at 55. Rather than having the parole commission review every federal sentence focused only on an offender's rehabilitation, Congress decided that 18 U.S.C. § 3582(c) could and would enable courts to decide, in individual cases, if "there is justification for reducing a term of imprisonment." *Id*. at 56.

Congress intended for the situations listed in 18 U.S.C. § 3582(c) to act as "safety valves for modification of sentences" to enable sentence reductions when justified by various factors that previously could have been addressed through the (now abolished) parole system. *Id*. at 121. This safety valve would "assure the availability of specific review and reduction to a term of imprisonment for 'extraordinary and compelling reasons' . . .." *Id*. (alterations added). Noting that this approach would keep "the sentencing power in the judiciary where it

belongs," rather than with the U.S. Parole Commission, the statute permitted "later review of sentences in particularly compelling situations." *Id.*

### B.    STATUTE

18 U.S.C. § 3582(c) provides in part that "the court . . . upon motion of the defendant after the defendant has fully exhausted all administrative rights to appeal a failure of the Bureau of Prison to bring a motion on the defendant's behalf or the lapse of 30 days from receipt of such a request by the warden of the defendant's facility, whichever is earlier, may reduce the term of imprisonment. In the case of Mr. Pimentel, the Warden failed to respond to counsel's initial request approximately 60 days ago. If it finds that extraordinary and compelling reasons warrant such a reduction" and if "such reduction is consistent with applicable policy statements issued by the Sentencing Commission." 18 U.S.C. § 3582(c)(1)(A)(i).

### C.    EXTRAORIDNARY AND COMPELLING REASONS

18 U.S.C. § 3852(c)(1)(A)(i) allows a court to reduce an inmate's sentence if the court finds that (1) "extraordinary and compelling reasons" warrant a reduction, (2) the reduction would be "consistent with any applicable policy statements issued by the Sentencing Commission," and (3) the applicable sentencing factors under § 3553(a) warrant a reduction.

Congress has not defined the term "extraordinary and compelling," but the Sentencing Commission ("Commission") has issued a policy statement defining the term. The policy statement lists three specific examples of "extraordinary and

compelling reasons," none of which apply to Mr. Pimentel U.S.S.G. § 1B1.13 cmt. n.1(A)-(C). It also provides a fourth "catchall" provision if the Director of the Bureau of Prisons determines that "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with, the reasons described." *Id.* § 1B1.13, cmt. n.1(D). Mr. Mr. Pimentel argues that, in light of the First Step Act, the Court is no longer bound by the policy statement.

Therefore, he argues, the Court can and should exercise its discretion to determine that "extraordinary and compelling reasons" exist for his release. The government may argue that Mr. Pimentel does not meet any of the enumerated criteria in the policy statement, and that the Court cannot independently assess whether other extraordinary and compelling reasons exist that warrant a sentence reduction.

It is concluded that (1) the Court may independently assess whether "extraordinary and compelling reasons" exist; (2) the COVID-19 pandemic—in combination with Mr. Pimentel underlying health conditions and rehabilitation—constitute "extraordinary and compelling reasons" that warrant a reduction; (3) Mr. Pimentel is not a danger to his community; and (4) the factors under § 3553(a) favor reducing Mr. Pimentel sentence. Therefore, I will ask that this Honorable Court grant the motion.

## 1. The Court May Decide Whether "Extraordinary and Compelling Reasons" Exist

Federal courts may reduce a prisoner's sentence under the circumstances Outlined in 18 U.S.C. § 3852(c). Under § 3852(c)(1)(A)(i), a court may reduce a prisoner's sentence "if it finds that" (1) "extraordinary and compelling reasons warrant

such a reduction" and

(2) the reduction is "consistent with applicable policy statements issued by the Sentencing Commission." Prior to 2018 only the Director of the Bureau of Prisons ("BOP") could file these kinds of "compassionate-release motions." *United States v. Brown*, 411 F. Supp. 3d 446, 448 (S.D. Iowa 2019).

The BOP rarely did so. The BOP was first authorized to file compassionate-release motions in 1984. From 1984 to 2013, an average of only 24 inmates were released each year through BOP-filed motions. *Hearing on Compassionate Release and the Conditions of Supervision Before the U.S. Sentencing Comm'n* (2016) (statement of Michael E. Horowitz, Inspector General, Dep't of Justice). According to a 2013 report from the Office of the Inspector General, these low numbers resulted, in part, because the BOP's "compassionate release program had been poorly managed and implemented inconsistently, . . . resulting in eligible inmates . . . not being considered for release, and terminally ill inmates dying before their requests were decided." *Id.* The report also found that the BOP "did not have clear standards as to when compassionate release is warranted and . . . BOP staff therefore had varied and inconsistent understandings of the circumstances that warrant consideration for compassionate release." *Id.*

Against this backdrop, Congress passed and President Trump signed the First Step Act in 2018, a landmark piece of criminal-justice reform legislation that "amend[ed] numerous portions of the U.S. Code to promote rehabilitation of

prisoners and unwind decades of mass incarceration." *Brown*, 411 F. Supp. 3d at 448 (citing Cong. Research Serv., R45558, *The First Step Act of 2018: An Overview* 1 (2019)). In an effort to improve and increase the use of the compassionate-release process, the First Step Act amended § 3852(c)(1)(A) to allow prisoners to directly petition courts for compassionate release, removing the BOP's exclusive "gatekeeper" role.

Congress made this change in § 603(b) of the First Step Act. Section 603(b)'s purpose is enshrined in its title: "Increasing the Use and Transparency of Compassionate Release." Section 603(b) was initially a standalone bill that "explicitly sought to 'improve the compassionate release process of the Bureau of Prisons.'" *Brown*, 411 F. Supp. 3d at 451 (quoting Granting Release and Compassion Effectively Act of 2018, S. 2471, 115th Cong. (2018).

The amendment to § 3852(c)(1)(A) provided prisoners with two direct routes to court: (1) file a motion after fully exhausting administrative appeals of the BOP's decision not to file a motion, or (2) file a motion after "the lapse of 30 days from the receipt . . . of such a request" by the warden of the defendant's facility, "whichever is earlier." 18 U.S.C. § 3852(c)(1)(A). These changes gave the "district judge . . . the ability to grant a prisoner's motion for compassionate release even in the face of BOP opposition or its failure to respond to the prisoner's compassionate release request in a timely manner." *United States v. Young*, 2020 WL 1047815, at *5 (M.D. Tenn. Mar. 3, 2020). The substantive criteria of § 3582(c)(1)(A)(i) remained the same.

Congress never defined the term "extraordinary and compelling reasons," except to state that "[r]ehabilitation . . . alone" does not suffice. 18 U.S.C. §

994(t). Rather, Congress directed the Sentencing Commission to define the term. *Id.* The Commission did so prior to the passage of the First Step Act but has not since updated the policy statement. *See* U.S.S.G. §1B1.13 cmt. n.1(A)-(D). In subsections (A)-(C) of an Application Note to U.S.S.G. §1B1.13, the Commission enumerated three specific "reasons" that qualify as "extraordinary and compelling": (A) terminal illness diagnoses or serious medical, physical or mental impairments from which a defendant is unlikely to recover, and which "substantially diminish" the defendant's capacity for self-care in prison; (B) aging-related health decline where a defendant is over 65 years old and has served at least ten years or 75% of her sentence; or (C) two family related circumstances: (i) death/ incapacitation of the only caregiver for the inmate's children or (ii) incapacitation of an inmate's spouse, if the inmate is the spouse's only caregiver. *See id.* cmt. n.1(A)-(C). The policy statement also added a catchall provision that gave the Director of the BOP the authority to determine if "there exists in the defendant's case an extraordinary and compelling reason other than, or in combination with" the other three categories. *Id.* cmt. n.1(D).

Thus, implicitly recognizing that it is impossible to package all "extraordinary and compelling" circumstances into three neat boxes, the Commission made subsections (A)-(C) non-exclusive by creating a catchall that recognized that other "compelling reasons" could exist. *See United States v. Urkevich*, 2019 WL 6037391, at *3 (D. Neb. Nov. 14, 2019) (noting that §1B1.13 never "suggests that [its] list [of criteria] is exclusive"); *United States v. Beck*, --- F. Supp. 3d ----, 2019 WL 2716505, at *8

(M.D.N.C. June 28, 2019)

("Read as a whole, the application notes suggest a flexible approach . . . [and] recognize that the examples listed in the application note do not capture all extraordinary and compelling circumstances.").

The Commission has not updated its policy statement to account for the changes imposed by the First Step Act,8 and the policy statement is now clearly outdated. The very first sentence of §1B1.13 constrains the entire policy statement to motions filed solely by the BOP. And an Application Note also explicitly confines the policy statement to such motions. *See* U.S.S.G. §1B1.13 ("Upon motion of the Director of the [BOP] . . . the court may reduce a term of imprisonment . . . ."); *id.* at cmt n.4 ("A reduction under this policy statement may be granted only upon motion by the Director of the [BOP]."); *see also Brown* at 449 (describing the old policy statement as "outdated," adding that the Commission "has not made the policy statement for the old [statutory] regime applicable to the new one."); *United States v. Ebbers*, --- F. Supp. 3d ----, 2020 WL 91399, at *4 (S.D.N.Y. 2020) (describing the old policy statement as "at least partly anachronistic").

Accordingly, a majority of district courts have concluded that the "old policy statement provides helpful guidance, [but] . . . does not constrain [a court's] independent assessment of whether 'extraordinary and compelling reasons' warrant a sentence reduction under § 3852(c)(1)(A)." *United States v. Beck*, --- F. Supp. 3d ---- , No. 13-cr-186-6, 2019 WL 2716505, at *6 (M.D.N.C. June 28, 2019); *see also Brown*, 411 F. Supp. 3d at 451 ("[T]he most natural reading of the amended § 3582(c) . . . is that the district court assumes the same

discretion as the BOP Director when it considers a compassionate release motion properly before it."); *United States v. Fox*, 2019 WL 3046086, at *3 (D. Me. July 11, 2019) ("[D]eference to the BOP no longer makes sense now that the First Step Act has reduced the BOP's role."); *United States v. Redd*, 2020 WL 1248493, at *7 (E.D. Va. Mar. 16, 2020) ("Application Note 1(D)'s prefatory language, which requires a [catchall] determination by the BOP Director, is, in substance, part and parcel of the eliminated requirement that relief must be sought by the BOP Director in the first instance.

. . . [R]estricting the Court to those reasons set forth in §1B1.13 cmt. n.1(A)-(C) would effectively preserve to a large extent the BOP's role as exclusive gatekeeper, which the First Step Act substantially eliminated . . . ."); *United States v. Young*, 2020 WL 1047815, at *6 (M.D. Tenn. Mar. 4, 2020) ("[T]he dependence on the BOP to determine the existence of an extraordinary and compelling reason, like the requirement for a motion by the BOP Director, is a relic of the prior procedure that is inconsistent with the amendments implemented by the First Step Act."); *Maumau*, 2020 WL at *2-*3 (D. Utah Feb. 18, 2020) (collecting cases).

A smaller number of courts have concluded that the Sentencing Commission's policy statement prevents district courts from considering any "extraordinary and compelling reasons" outside of those listed in subsections (A)-(C) of the policy statement. *See, e.g., United States v. Lynn,* 2019 WL 3805349, at *2-*5 (S.D. Ala. Aug. 12, 2019); *United States v. Shields*, 2019 WL 2359231, at *4 (N.D. Cal. June 4, 2019); *United States v. Willingham*, 2019 WL 6733028, at *2 (S.D. Ga.

Dec. 10, 2019). The government urges this Court to follow these minority decisions.

The conclusion reached by the majority of courts is more persuasive. It is true that §3852(c)(1)(A) requires courts to act consistently with *applicable* policy statements under the Sentencing Guidelines, but the Sentencing Commission simply has not issued a policy statement that addresses prisoner-filed motions post-First Step Act:

> There is no policy statement applicable to motions for compassionate release filed by defendants under the First Step Act. By its terms, the old policy statement applies to motions filed by the [BOP] Director and makes no mention of motions filed by defendants. . . . The Sentencing Commission has not amended or updated the old policy statement since the First Step Act was enacted, nor has it adopted a new policy statement applicable to motions filed by defendants.

*Beck*, --- F. Supp. 3d ----, 2019 WL 2716505, at *5 (citations omitted). The introductory sentence of §1B1.13, "*[u]pon motion of the Director of the [BOP . . . the court may reduce a term of imprisonment*," limits the policy statement's scope to a procedural scheme exclusively involving the BOP that does not exist anymore. And comment 4 of §1B1.13's Application Note expressly states that "[a] reduction *under this policy statement may be granted only upon motion by the Director of the [BOP]*." Accordingly, by its own terms, the scope of the old policy statement is clearly outdated and, at the very least, does not apply to the entire field of post-First Step Act

motions. In other words, for prisoner-filed motions, there is a gap left open that no "applicable" policy statement has addressed. Therefore, the policy statement may provide "helpful guidance" but does not limit the Court's independent assessment of whether "extraordinary and compelling reasons" exist under § 3582(c)(1)(A)(i). *See Beck* at *6; *Fox*, 2019 WL 3046086, at *3 ("I agree with the courts that have said that the Commission's existing policy statement provides helpful guidance . . . [but] is not ultimately conclusive given the statutory change.").

Minority cases like *Lynn* attempt to refute this point by minimizing the impact of the First Step Act's changes. *See Lynn*, 2019 WL 38505349, at *4 n.5 ("While Section 1B1.13 and application note 4 reference motions brought by BOP, this merely restates the restriction on proper movants [that existed] prior to the [First Step] Act . . . ."). The First Step Act, however, significantly altered the landscape of compassionate-release motions and created a procedural gap that the Sentencing Commission's policy statement never had a chance to address.

When the Commission wrote its policy statement, a motion could reach the court only through the BOP. By providing the catchall provision, the Commission recognized that it may be impossible to definitively predict what reasons may qualify as "extraordinary and compelling." Rather than attempt to make a definitive prediction, the Commission covered all of its bases by ensuring that *every motion* to reach the court would have an opportunity to be assessed under the flexible catchall provision. At the time the Commission wrote, the catchall provision's BOP-focused language accomplished that task, because every motion to reach the court necessarily had to be filed and approved by the BOP.

Therefore, this Court has discretion to assess whether Mr. Pimentel presents "extraordinary and compelling reasons" for his release outside of those listed in the non-exclusive criteria of subsections (A)-(C) of the old policy statement. Of course, this policy statement remains informative in guiding my determination. *See, e.g.*, *Fox*, 2019 WL 3046086, at *3 ("[T]he Commission's existing policy statement provides helpful guidance on the factors that support compassionate release, although it is not ultimately conclusive. . . ."); *Beck*, 2019 WL 2716505, at *7 ("While the old policy statement provides helpful guidance, it does not constrain the Court's independent assessment . . . ."); *United States v. Lisi*, 2020 WL 881994, at *3 (S.D.N.Y. Feb. 24, 2020) ("[T]he Court may independently evaluate whether [defendant] has raised an extraordinary and compelling reason for compassionate release . . . [but §1B1.13's policy statement] remain[s] as helpful guidance to courts . . . .").

## 2. Extraordinary and Compelling Reasons Exist Here

Mr. Pimentel circumstances present extraordinary and compelling reasons to reduce his sentence. Particularly, the outbreak of COVID-19 and his underlying medical conditions place him at a high risk of contracting this disease. Black's Law Dictionary defines "extraordinary" as "[b]eyond what is usual, customary, regular, or common." Extraordinary, Black's Law Dictionary (11th ed. 2019). It defines "compelling need" as a "need so great that irreparable harm or injustice would result if it is not met." Compelling Need, Black's Law Dictionary (11th ed. 2019).

Mr. Pimentel has extraordinary and compelling reasons to reduce his sentence. First, he suffers from underlying health conditions that render him especially vulnerable to COVID-19. Second, prison is a particularly dangerous place for Mr. Pimentel at this moment.

Third, he has shown commendable rehabilitation while in prison. Finally, due to the COVID the prison has stopped most programs including RDAP. Mr. Pimentel was only 2 months short from completing the program thus reducing his sentence by one year. None of these reasons alone is extraordinary and compelling. Taken together, however, they constitute reasons for reducing his sentence "[b]eyond what is usual, customary, regular, or common," and reasons "so great that irreparable harm or injustice would result if [the relief] is not [granted]." Extraordinary, Black's Law Dictionary (11th ed. 2019); Compelling Need, Black's Law Dictionary (11th ed. 2019).

**3. Mr. Pimentel is Not a Danger to Others or the Community**

The Commission's policy statement, which provides helpful guidance, provides for granting a sentence reduction only if "[t]he defendant is not a danger to the safety of any other person or to the community, as provided in 18 U.S.C. § 3142(g)." U.S.S.G. § 1B1.13(2).

Mr. Pimentel is not a danger to the safety of others or to the community under the factors listed in in 18 U.S.C. § 3142(g). Section 3142(g) sets out the factors courts must consider in deciding whether to release a defendant pending trial. These factors weigh both the defendant's possible danger to the community and the defendant's likelihood to appear at trial. Only the former is relevant here.

The factors that weigh danger to the community include "the nature and circumstances of the offense charged," "the history and characteristics of the person," including "the person's character, physical and mental condition, family ties, . . . community ties, past conduct, history relating to drug or alcohol abuse, [and] criminal history," and "the nature and seriousness of the danger to any person or the community that would be posed by the person's release." 18 U.S.C. § 3142(g).

The present case is the extent of Mr. Pimentel criminal history. I would say that during this pandemic he is even less of a danger because he has a home to return to where he can self-quarantine with an adequate reentry plan.

### 4. The Sentence Reduction is Consistent with the Section 3553(a) Factors

Finally, the Court must "consider the sentencing factors set forth in section 3553(a) to the extent that they are applicable." 18 U.S.C. § 3582(c)(1)(A). The applicable sentencing factors warrant a sentence reduction for Mr. Pimentel. Because section 3553(a) establishes factors to consider in initially imposing a sentence, not every factor applies here. The applicable factors are:

(1) the nature and circumstances of the offense and the history and characteristics of the defendant;

(2) the need for the sentence imposed—

(A) to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense;

(B) to afford adequate deterrence to criminal conduct;

(C) to protect the public from further crimes of the defendant; and

(D) to provide the defendant with needed educational or vocational
training, medical care, or other correctional treatment in the most
effective manner;

. . . [and]

(6) the need to avoid unwarranted sentence disparities among
defendants with similar records who have been found guilty of
similar conduct[.]

18 U.S.C. § 3553(a). The statute also mandates: "The court shall impose a sentence sufficient, but not greater than necessary, to comply with the purposes set forth in paragraph (2)." Id.

(3)  The first factor is "the nature and circumstances of the offense and the history and characteristics of the defendant." Id. § 3553(a)(1). As described above, Mr. Pimentel lacks any criminal history.

(4)  The second factor is the need for the sentence imposed to serve the enumerated purposes of punishment. Id. § 3553(a)(2). The court should "impose a sentence sufficient, but not greater than necessary, to comply with [these] purposes." Id. § 3553(a). The sentence served has been long enough to reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct, and protect the public from further crimes of Mr. Pimentel rather than being long enough to provide Mr. Pimentel with needed medical care, it may interfere with his ability to get needed medical care. To prolong his

incarceration further would be to impose a sentence "greater than necessary" to comply with the statutory purposes of punishment.

(5)     The final relevant factor is "the need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct." Id. § 3553(a)(6). Mr. Pimentel has already served time in jail and these are extraordinary times with immense stress and medical risk factors. One could argue that under the current stress and risk in jail, one day equals the punishment of three days in jail under normal circumstances. Therefore, granting his motion sufficiently minimizes sentencing disparities between him and similar situated defendants.

**PRE-EXHAUSTION**

Section 3582(c)(1)(A) requires administrative exhaustion however the United States Supreme Court states that an exception to exhaustion exists where "the interest of the individual weigh heavily against the administrative exhaustion." *McCarthy v. Madigan*, 503 U.S. 140, 146 (1992). One exception to exhaustion is where it may occasion undue prejudice to the Defendant. *Id. See United States v. Minor, Case No. 18-80152-CR-MIDDLEBROOKS [S.D. Fla. April 17, 2020]; United States v. Lima, 16-20088-CR-SCOLA (May 11, 2020); United States v. Saad, Case No. 2:16-cr-20197, Dkt No. 64 [E.D. Mich. April 29, 2020]; Washingtin v. Barr, 925 F.3d 109, 118 (2d Cir. 2019)*

On June 29, 2020, 2020, Mr. Pimentel, through counsel, submitted a letter with a request to Warden Sylvester Jenkins at FCI Miami requesting for

his remaining prison sentence to be converted to home confinement. Subsequently this request was never answered.

**Covid-19 and the Prison System**

It has become clear detention and correctional facilities are facing a major challenge controlling the spread of COVID-19 due to the crowded dormitories, shared bathrooms, limited medical and isolation resources and the potential introduction of the virus by staff members and new intakes. The nature of this virus has allowed these detention facilities to become the perfect place for it to spread like wildfire. As was stated by the Federal Bureau of Prisons Director Michael D. Carvajal to the Committee on the Judiciary United States Senate(https://www.judiciary.senate.gov/download/carvajal-allen-joint-testimony), prisons are not designed for social distancing, they are made for quite the opposite. CDC guidelines for combating COVID-19 explicitly highlight the fact that social distancing and proper personal hygiene go a long way in preventing its spread. Director Carbajal mentions in his statement that the BOP has taken reactive measures in modifying their operations to minimize co-mingling, group gatherings and decrease the flow of people from the communities to the prisons, but even with these measures in place it is impossible to guarantee the safety of any individual in a custodial setting due to the inherent fact that social distancing is not an option.

In response to the statement by the Director of the BOP at the Senate Judiciary Committee hearing (https://keller.house.gov/media/press-releases/congressman-fred-keller-comments-bureau-prisons-testimony-senate-judiciary), Congressman

Fred Keller calls attention to the fact that even with all the measures imposed to protect the inmates and staff the BOP has seen more deaths than seven different states despite having far less of a population to oversee. According to the BOP website (https://www.bop.gov/coronavirus/), as of June 8, 2020, there are 2068 federal inmates and 185 BOP staff who have tested positive for COVID-19. Additionally, they also included that there have been 78 federal inmate deaths and 1 BOP staff member death due to this virus.

These numbers are not completely accurate they are slightly higher due to the fact that the inmate totals listed do not include inmates participating in the Federal Location Monitoring program, inmates supervised under the USPO, or inmates being held in privately managed prisons like is the case of Mr. Pimentel. Criminal justice reform advocates and educators have been sounding the alarm for the public – and the government – about the unprecedented risks faced by correction officials and inmates in state and federal prison facilities. A March 16, 2020 opinion piece for The New York Times entitled An Epicenter of the Pandemic Will Be Jails and Prisons, If Inaction Continues highlights why the risks of spreading disease is so high for those who are incarcerated: "In America's jails and prisons, people share bathrooms, laundry and eating areas. The toilets in their cells rarely have lids. The toilet tank doubles as the sink for hand washing, tooth brushing and other hygiene. People bunked in the same cell – often as many as four – share these toilets and sinks. Meanwhile, hand sanitizer is not allowed in most prisons because of its alcohol content. Air circulation is nearly always poor. Windows rarely open; soap may only be available if you can pay for it from the

commissary." See https://www.nytimes.com/2020/03/16/opinion/coronavirus-in-jails. html. Likewise, an opinion piece for the Washington Examiner entitled Coronavirus Will Turn Our Prisons into Death Zones Without Reform described similar conditions and risks. It also reasoned that even those serving long sentences should not be put at risk of serious illness or even death from the coronavirus:

> [W]e can all agree that these individuals do not deserve death sentences or to be exposed to serious illness. The reality remains that if serious steps are not taken, this is exactly the fate many prisoners face.

> The jails and prisons in our country are filthy, and prisoners lack access to supplies that could help them prevent the spread of the virus. Basic items such as soap, tissues, and cleaning supplies are often only available for purchase. And other items, such as alcohol-based hand sanitizer, are flat-out banned.

> To make matters worse, prisoners are often kept in close quarters. Large numbers of people are all using a limited number of bathrooms. Sinks are often broken, and water is frequently dirty. Even in the best of times, prisons are ripe for infections and disease. Suffice it to say now is not the best of times.

See https://www.washingtonexaminer.com/opinion/coronavirus-will-turn-our-prisons-into-deathzones-without-reform. And, a Fox News article published yesterday entitled Coronavirus Crisis Requires This Action Be Taken for Elderly Prison Inmates analogized the disaster faced by the Life Care Center of Kirkland, WA (arguably the epicenter of the coronavirus outbreak in the United States) and conditions within state and federal prison facilities: "[W]e saw what can happen when coronavirus hits a vulnerable population. The illness spread rapidly, infecting 59 of the 72 residents and more than a quarter of the staff. As of Monday, 29 people have died. If we don't act now, a similar catastrophe will take place inside prisons across our country, and it won't be long before it spreads from there." See https://www.foxnews.com/opinion/tolmanand-harris-coronavirus-crisis-requires-this-action-for-elderly-prison-inmates. These informed commentaries echo the calls coming from a range of criminal justice and public health groups calling for the release of inmates who are at risk for infection and death from COVID-19 to mitigate the public health risks and resource challenges created by crowded prisons and jails.

As of this writing, it appears that the government has no proactive plan for protecting those in its custody from the inevitable, oncoming onslaught of coronavirus cases in the BOP's prison facilities. According to the "Federal Bureau of Prisons COVID-19 Action Plan" (https://www.bop.gov/ resources/ news/20200313_covid-19.jsp), the BOP has suspended social visits, inmate travel, staff travel and training for 30 days. That "Action Plan" also states that the BOP intends to use the following practices to "address the specific issues involving

COVID-19": (1) all newly-arriving BOP inmates are to be screened for coronavirus exposure risk factors and symptoms; (2) asymptomatic inmates with exposure risk factors will be quarantined; and (3) symptomatic inmates with exposure risk factors will be isolated and tested for COVID-19 per local health authority protocols. Given that cities like San Francisco are completely locked-down, cities like New York have ordered the closing of all bars and restaurants (except for take-out and delivery) and even President Trump advised Americans to avoid groups of more than 10 people, the BOP's plan for addressing the coronavirus crisis is woefully inadequate and, without immediate and radical modification, put tens of thousands of inmates and staff at high risk for infection and, in some cases, death.

By contrast, other large-scale prison systems are actively putting aggressive plans into place in response to the COVID-19 crisis. For example, the NYC Board of Correction stated earlier this week that the City of New York should start releasing inmates who are at risk of contracting the coronavirus and start make efforts to rapidly decrease jail populations. See https://www.nydailynews.com/coronavirus/ny-coronavirus-board-of-correction-release-inmates-nyc-jails-20200317-sfavifzqznhwpayhtcmadwkh6e-story. html. Last night Mayor Bill de Blasio announced that "[i]n the next 48 hours, we will identify any inmates who need to be brought out because of either their own health conditions – if they have any preexisting conditions, etc. – or because the charges were minor and we think it's appropriate to bring them out in this context." See https://nypost.com/2020/03/18/nyc-to-begin-releasing-inmates-amid-coronavirus-outbreak/. The Los Angeles County Sheriff's Department is releasing inmates

from its jails and cutting down on how many people it books into custody to protect those housed in close quarters from the growing coronavirus pandemic. See https://www.latimes.com/ california/story/2020-03-16/la-jail-population-arrests-down-amid-coronavirus. And, the Texas Commission of Jail Standards has recommended Texas jails work to release non-violent misdemeanor inmates due to the coronavirus pandemic.

See https://www.kxxv.com/news/local-news/texas-jails-to-releasenon-violent-misdemeanor-inmates-due-to-coronavirus-pandemic.

Given the rapidly evolving COVID-19 crisis, the foregoing are likely but the first of many waves of pre-trial detainee and inmate releases that the criminal justice system will have to institute to control the spread of coronavirus in the nation's prisons and jails. Moreover, given the BOP's inability to effectively deal with other far less serious issues, like the loss of power and heat at the MDC Brooklyn last winter. It is highly questionable whether the BOP will be able to effectively deal on its own with an unprecedented, nationwide crisis like the coronavirus pandemic. For this reason and others, federal prosecutors, defense attorneys and judges have an added responsibility to begin addressing and mitigating, in whatever ways they can, the looming criminal justice crisis that lurks within this fast-moving public health epidemic.

***(See Exhibit B- CDC Risk Factors)***

***(See Exhibit C- Statement of Michael D. Carvajal Director, Federal Bureau of Prisons And Dr. Jeffery Allen Medical Director, Federal Bureau of Prisons Before the Committee on the Judiciary United States Senate)***

***(See Exhibit D- Infection Statistics BOP)***

**Mr. Pimentel Particular Medical Situation**

Mr. Pimentel suffers from upper respiratory disease, congestive heart failure, hypertension, hyperchloestedalmia, hyperlipidemia, and supraventricular tachychardia.

**Reentry Plan and Protection of the Community**

If released from custody, Mr. Pimentel would be living with his wife in Miami Dade County. This lifestyle would have him residing at home being cared for by his family 24/7.   His age and extensive preexisting medical condition places him in a very serious and dangerous situation

If Mr. Pimentel were to contact COVID-19 his odds of survival would be extremely low.

**Conclusion**

Mr. Pimentel has been and is suffering from the reported medical conditions that place him at a high risk of serious illness from COVID-19 if he remains detained. He is being housed FCI Miami  a "LOW" security level facility and has a spotless history with the BOP. He was convicted of a low level, white collar criminal offense involving conspiracy to commit money laundering.

As the BOP has limited healthcare resources and is already battling to contain the spread of this virus, Mr. Pimentel should be allowed to serve the remainder of his sentence on house arrest.

     **Wherefore,** the Defendant through undersigned counsel petitions this Court to release Mr. Pimentel from custody and grant this motion for compassionate release.

**CERTIFICATE OF SERVICE**

     **I HEREBY CERTIFY** that a true and correct copy of the foregoing was Efiled and a copy furnished to the Office of the United States Attorney on August 22, 2020.

Respectfully Submitted,

/s/*Steven E. Amster*
STEVEN E. AMSTER, ESQUIRE
Attorney for the Defendant
7685 SW 104 Street, Suite 200
Miami, Florida 33156
Phone: (305) 371-2455
Florida Bar No. 005738